**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>Calais Regional Hospital,<br><br>                  Debtor | Chapter 11<br>Case No. 19-10486 |
| Calais Regional Hospital,<br><br>                  Plaintiff<br>v.<br><br>Anthem Health Plans of Maine, Inc.,<br>d/b/a Anthem Blue Cross Blue Shield,<br><br>                  Defendant | Adv. Proc. No. 19-1015 |

## MEMORANDUM OF DECISION

Many would agree that the market for healthcare in this country differs, in several material respects, from the markets for other goods. Some would agree that the healthcare market suffers from several anomalies. The plaintiff in this adversary proceeding, a critical access hospital in Calais, Maine, seeks to wield fraudulent transfer law to address one of these perceived anomalies: pricing. More specifically, the plaintiff asserts that the defendant, an insurance company, did not pay reasonably equivalent value for the healthcare services that the plaintiff provided to insured patients. The plaintiff seeks to recover amounts in excess of the amounts that the defendant agreed to pay for those services.

The defendant contends that the complaint fails to state a claim upon which relief may be granted and must therefore be dismissed. The defendant's motion to dismiss is well-founded and will be granted in substantial part.

## **The Rule 12(b)(6) Framework**

In most instances, the Rule 12(b)(6) prism is translucent. To determine whether a pleading states a claim upon which relief can be granted, the allegations contained in the pleading are separated into two groups: (1) the well-pleaded allegations of fact, which must be credited as true and viewed in the light most favorable to the pleader, and (2) legal conclusions and unadorned recitals of statutory elements, which must be disregarded. *See* Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009). A factual allegation will fall into the second group and be disregarded if it is "so threadbare or speculative" that it fails "to cross the line between the conclusory and the factual." Peñalbert-Rosa v. Fortuño-Burset, 631 F.3d 592, 595 (1st Cir. 2011) (quotation marks omitted). The fate of a Rule 12(b)(6) motion usually hinges solely on the well-pleaded factual allegations in the complaint. Young v. Lepone, 305 F.3d 1, 10-11 (1st Cir. 2002). In the right case, however, this narrow vantage can be expanded. For example, the Court may consider facts susceptible to judicial notice and implications from documents incorporated into the complaint, Newman v. Krintzman, 723 F.3d 308, 309 (1st Cir. 2013), and may do so without converting the proceeding into one for summary judgment, Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).

As is often the case, the Rule 12(b)(6) framework has been clouded by a defendant eager to bring a nascent lawsuit to an early end. Here, Anthem has asked the Court to look to a number of extrinsic documents that, in Anthem's view, "show that Anthem actually provided reasonably equivalent value for the services . . . provided to Anthem's members[.]" [Dkt. No. 8 p. 2.] Given the relative lack of detail for many of the central factual allegations, Anthem's effort to provide additional details is understandable. Some of the extrinsic documents may be closely connected with the claims advanced by Calais Regional Hospital ("CRH"), such that

consideration of the documents in this procedural setting might be permissible. And yet, CRH has avoided incorporating the documents into the complaint and has reserved the right to challenge Anthem's characterization of them. More fundamentally, Anthem's motion does not present an opportunity to resolve the parties' dispute about whether Anthem did, or did not, provide reasonably equivalent value to CRH. *See* 5B Wright & Miller, Federal Practice & Procedure § 1356 (3d ed.) ("[A] motion under Federal Rule 12(b)(6) . . . is not a procedure for resolving a contest between the parties about the facts[.]") (footnote omitted); *see also* Janvey v. Wieselberg, No. 3:10-CV-1394-N, 2014 WL 2883897, at *2 (N.D. Tex. June 25, 2014) (declining to look beyond the pleadings to make the factual determination of whether reasonably equivalent value was advanced where the pleadings themselves did not clearly establish that reasonably equivalent value was lacking). Examination of the extrinsic documents is not necessary to grant Anthem the relief it seeks. As such, the Court will neither consider these extrinsic documents nor convert the motion to one under Rule 56. *See* Carione v. United States, 368 F. Supp. 2d 186, 191 (E.D.N.Y. 2005) (discussing courts' discretion with respect to extrinsic materials offered in conjunction with a Rule 12(b)(6) motion and in deciding whether to convert the motion to one for summary judgment). With one exception (which is noted below), the facts are derived solely from the allegations in the complaint. Allegations included in the complaint but omitted from the following recitation have been disregarded as conclusory or immaterial.

## The Facts

CRH is a non-profit corporation operating as a critical access hospital in Calais, Maine. Anthem is a corporation that provides insurance to individuals, either directly or through employer-based health plans. On September 17, 2019 (the "Petition Date"), CRH filed its chapter 11 case and now continues as a debtor-in-possession.

During the six years prior to the Petition Date, CRH entered into one or more contracts ("Contracts") with Anthem regarding the rates Anthem agreed to pay CRH for goods or medical services ("Medical Services") for individuals insured by Anthem ("Insureds"). During that same period, CRH also entered into one or more agreements with Anthem regarding repayment of amounts allegedly overpaid by Anthem to CRH under the Contracts ("Collection Agreements"). For example, under the Collection Agreement made in July 2019, CRH agreed to a settlement payment plan for calendar year 2018, consisting of certain weekly deductions from Anthem's regular payments to CRH in 2019, followed by a lump-sum payment due at the end of December 2019.[1]

During the six years prior to the Petition Date, CRH provided Medical Services to Insureds. During this period, CRH billed Anthem for the Medical Services provided to Insureds and received payments from Anthem in amounts less than the billed amounts. After receipt of these payments, CRH wrote off, parted with, or otherwise released unpaid accounts receivable or claims for further payment from Anthem. The rates paid by Anthem to CRH for some or all of the Medical Services provided by CRH were less than the rates Anthem or an affiliate paid to other hospitals in Maine and outside of Maine for the same or similar services. Anthem or an affiliate paid higher rates to certain hospitals due to the negotiating power or bargaining leverage of those hospitals and not as a result of value added to services by those hospitals.

Independent auditors for CRH included the following note in the hospital's audited financial statements for calendar year 2018: "[T]he Hospital has experienced significant operating losses for several years. This factor and the resulting impact on cash flows raise

---

[1] The complaint expressly refers to this extrinsic document and there is no apparent dispute about its relevance or authenticity.

substantial doubt about its ability to continue as a going concern." The auditors made similar notes regarding the hospital's financial improvement plans from 2013 to 2017.

## The Plausibility Standard

With the universe of facts properly assembled, the plausibility standard can be applied. A complaint states a plausible claim if the factual content permits the reasonable inference that the plaintiff is entitled to the relief it seeks. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level."). "If the facts articulated in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is vulnerable to a motion to dismiss." Privitera v. Curran (In re Curran), 855 F.3d 19, 25 (1st Cir. 2017) (quotation marks omitted). The elements of a cause of action are "part of the background against which a plausibility determination should be made" and "may be used . . . to shed light upon the plausibility of the claim." See Rodriguez-Reyes v. Molina-Rodriguez, 711 F.3d 49, 54 (1st Cir. 2013). To tether the Rule 12(b)(6) analysis to the elements of the claims raised by CRH, the discussion begins with an overview of the statutes under which the claims arise.

## Discussion

In Count I, CRH seeks to avoid constructive fraudulent transfers under 11 U.S.C. § 544 and the Uniform Fraudulent Transfer Act, Me. Rev. Stat. Ann. tit. 14, §§ 3571-3582 ("UFTA"). In Count II, CRH seeks to avoid those same transfers under 11 U.S.C. § 548. More specifically, CRH seeks judgment in an amount equal to the difference between: (a) the amount Anthem paid CRH for Medical Services provided to Insureds and (b) the reasonably equivalent value of those Medical Services. Count III also relies on section 544 and UFTA, but seeks an order avoiding the Contracts and Collection Agreements and the obligations that CRH incurred under them.

Count IV similarly invokes section 548 in an effort to avoid the Contracts and Collection Agreements and obligations that CRH incurred under them.

Section 544(b)(1) generally permits the trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502[.]"  11 U.S.C. § 544(b)(1).  CRH looks to Me. Rev. Stat. Ann. tit. 14, §§ 3575 and 3576 as the applicable law that may be accessed through section 544(b)(1).  In relevant part, section 3575 provides:

> **1. Fraudulent transfer.**  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> . . . .
>
> B. Without receiving a reasonably equivalent value in exchange for the transfer or obligations and the debtor:
> (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> (2) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as the debts became due.

Me. Rev. Stat. Ann. tit. 14, § 3575(1).  As relevant here, section 3576 provides:

> **1. Transfers without receipt of reasonably equivalent value.**  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Me. Rev. Stat. Ann. tit. 14, § 3576(1).

Section 548(a)(1)(B) provides an alternative path for avoiding fraudulent transfers, which CRH invokes in Counts II and IV:

> The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within

> 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> . . . .
>
>> (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>>  (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>>  (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or]
>>  (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured[.]

11 U.S.C. § 548(a)(1)(B). The elements of a cause of action to avoid constructively fraudulent transfers under UFTA or under section 548(a)(1) include the transfer of an interest of the debtor in property or the incurrence of an obligation by the debtor, and lack of reasonably equivalent value in exchange for the transfer or obligation. Here, although the complaint contains allegations that bear upon these elements, those allegations are too speculative, threadbare, and conclusory to make out plausible claims. The following discussion sheds more light on the specific defects in the complaint.

### A. Transfer of an Interest in Property

The Bankruptcy Code defines the term "transfer" to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with" property or an interest in property. 11 U.S.C. § 101(54)(D). Like the Code, UFTA defines the term "transfer" to mean "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset," including by way of release. Me. Rev. Stat. Ann. tit. 14, § 3572(12). Under UFTA, "asset" is generally defined as "property of a debtor, but does not include . . . [p]roperty to the extent that it is encumbered by a

valid lien[.]" Id. § 3572(2).  In the fraudulent transfer context, the Court ordinarily looks to state law to define the existence and extent of a debtor's property interest.  Darr v. Dos Santos (In re TelexFree, LLC), 941 F.3d 576, 584 (1st Cir. 2019) (looking to state law and concluding that the debtor had a property interest for the purposes of section 548); Keach v. Wheeling & Lake Erie Ry. Co. (In re Montreal, Me. & Atl. Ry., Ltd.), 888 F.3d 1, 7-8 (1st Cir. 2018) (looking to Maine law to determine whether the debtor held a property interest for purposes of UFTA).

The purpose of fraudulent transfer law "is to preserve the debtor's estate for the benefit of unsecured creditors[.]"  DeGiacomo v. Sacred Heart Univ., Inc. (In re Palladino), 942 F.3d 55, 59 (1st Cir. 2019).  Fraudulent transfer statutes stand as a guard against improper diminutions of the assets available to satisfy the claims of a debtor's unsecured creditors.  Unif. Fraudulent Transfer Act § 1 cmt. 2 (1984).  For this reason, "courts evaluate transfers from the creditors' perspective, measuring value" and evaluating the existence of the assets in question "at the time of the transfer," In re Palladino, 942 F.3d at 59 (citations omitted).  UFTA excludes encumbered property from the definition of "asset" precisely because such property is unavailable to satisfy the claims of unsecured creditors.  As a necessary corollary, the plaintiff in a fraudulent transfer suit must plead and later prove the existence of an asset that would have been available to satisfy an unsecured creditor's claim if the transfer had not been made (or the obligation had not been incurred).

CRH's complaint does not identify, with precision, the interest in property that CRH transferred or the asset it disposed of, or parted with, for UFTA purposes.  When asked about this imprecision at oral argument, CRH replied that the property transferred consisted of its claims for further payment from Anthem, and pointed to the allegation that it wrote off, parted with, or released accounts receivable or claims for further payment from Anthem.  At first blush, this

- 8 -

allegation looks like it could satisfy the element of "transfer" for purposes of Counts I and II. But the theory does not withstand closer scrutiny.

In the complaint, CRH alleges that it had a right to payment from Anthem for Medical Services provided to Insureds, and that it entered into Contracts with Anthem regarding the rates Anthem agreed to pay for Medical Services provided to Insureds. CRH also alleges that it provided Medical Services to Insureds (not to Anthem). That is the extent of the pertinent allegations, however. CRH did not, for example, allege that it billed Anthem at the rates specified in the Contracts, that Anthem paid some amounts less than those rates, and that CRH wrote off the unpaid receivables which were otherwise due and payable under the terms of the Contracts. The complaint is entirely lacking in factual detail regarding the relationship, if any, between the amounts specified in the Contracts, the amounts billed by CRH, and the amounts actually paid by Anthem. That silence may have been by design, as CRH included the following arguments in its written opposition to the motion, expressly disavowing reliance on any breach of contract theory:

> Causes of action seeking to recover fraudulent transfers are asserted by third-party creditors whose ability to receive payment on economic claims has been harmed by a transferee paying less than reasonably equivalent value to a transferor. The Debtor is entitled to assert these claims and seek recovery of fraudulent transfers on behalf of creditors of its estate pursuant to §§ 544, 548, and 1107(a) of the Bankruptcy Code. *The Debtor's claims against Anthem arise in that context— they are claims of the Debtor's creditors that the Debtor can bring by virtue of having the rights and powers of a bankruptcy trustee. They are not breach of contract claims brought in the Debtor's own right as a party to a consensual agreement.* In fact, even if the transactions at issue between the Debtor and Anthem fully complied with any relevant contractual terms, they can still be constructively fraudulent transfers.

[Dkt. No. 24 p. 11-12] (emphasis added).

CRH fails to articulate the basis of any claims that its creditors might have against Anthem not arising out of the Contracts. In the absence of any suggestion to the contrary, it is

reasonable to infer that CRH's right to payment from Anthem was limited to the amounts specified in the Contracts and that Anthem in fact paid CRH at the rates specified in the Contracts. When those inferences are drawn, the fraudulent transfer theory crumbles. If Anthem paid CRH at the rates specified in the Contracts, CRH would not have had any claims for further payment from Anthem under the Contracts and would have had no additional accounts receivable to part with, write off, or release.[2]

CRH contends that a transfer made pursuant to a contract can be avoided as a fraudulent transfer. True enough. If an insolvent debtor enters into a contract to sell an asset worth $1,000,000 for $5,000 and then performs under that contract, the purchaser cannot defend a fraudulent transfer action solely by pointing to the contract. But this truism does not help CRH identify the existence of the asset allegedly transferred. The cases cited by CRH are readily distinguishable: each features a debtor who unquestionably transferred an asset. *See, e.g.,* Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors (In re R.M.L., Inc.), 92 F.3d 139 (3d Cir. 1996) (discussing whether reasonably equivalent value was given in exchange for $515,000 in fees that the debtor paid to a third party); EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.), 356 B.R. 631, 637 (Bankr. D. Del. 2006) ("The Court agrees . . . that the termination of the Contract . . . resulted in a transfer of property of the Debtor, namely the advertising services for which the Debtor had pre-paid.").

Given the dearth of any plausible allegations that CRH had a property interest in any claims for further payment from Anthem, CRH fails to state a claim that such an interest was fraudulently transferred. *See* In re Montreal, Me. & Atl. Ry., 888 F.3d at 11-12 (concluding that

---

[2] If Anthem did not pay CRH at the rates specified in the Contracts, or if there is a right to payment from Anthem under some theory other than contract law, CRH should make those allegations and claims explicit in any amended pleading.

- 10 -

complaint to avoid fraudulent transfers under UFTA failed to state a plausible claim where pleading did not identify an interest of the debtor in property that would have become property of the estate but for the alleged transfer); Phila. Entm't & Dev. Partners, LP v. Pa. Dep't of Revenue (In re Phila. Entm't & Dev. Partners, LP), 611 B.R. 51, 73-77 (Bankr. E.D. Pa. 2019) (concluding that plaintiff failed to state plausible claims under UFTA and section 548 where license at issue did not constitute a property interest for fraudulent transfer purposes).

### B. Lack of Reasonably Equivalent Value

As Anthem correctly observes, the element of reasonably equivalent value also presents a stumbling block for CRH in its efforts to state plausible claims. In section 548, "value" is generally defined as "property, or satisfaction or securing of a present or antecedent debt of the debtor[.]" See 11 U.S.C. § 548(d)(2)(A). UFTA provides a similar definition. See Me. Rev. Stat. Ann. tit. 14, § 3574(1). Neither the Code nor UFTA define the term "reasonably equivalent value." In the absence of a statutory definition, the test of reasonable equivalence boils down to a comparison of the value given up by the debtor and the value received in exchange. See Nickless v. Pappas (In re Prime Mortg. Fin., Inc.), BAP No. MW 10-035, 2011 WL 4572006, at *4 (B.A.P. 1st Cir. Feb. 14, 2011). Reasonable equivalence is lacking where there is a "significant disparity" between the value given up and the value received. See id. Here, the allegations in the pleading do not permit any comparison between the value relinquished by CRH and the value received from Anthem in exchange. The complaint contains the unadorned allegation that CRH did not receive reasonably equivalent value in exchange for the alleged transfers. The complaint also contains the allegation that CRH incurred unspecified obligations under the Contracts or Collection Agreements without receiving reasonably equivalent value in exchange. Under the pleading standards prescribed in Twombly and Iqbal, these bald recitations

are not entitled to a presumption of truth. Although the complaint contains a few more detailed allegations that bear upon the reasonable equivalence element, they do not nudge the pleading over the plausibility threshold. A brief explanation is in order.

First, CRH alleges that it billed Anthem some unspecified amounts, that Anthem paid unspecified amounts less than the amounts billed, and that CRH then released its claims for further payment from Anthem. Without any alleged figures for the amounts billed by CRH and the lesser amounts paid by Anthem, the allegation is too vague and speculative to permit a reasonable inference that CRH in fact received less than reasonably equivalent value for the Medical Services provided to Insureds. *See* Cruickshank v. Dixon (In re Blast Fitness Grp., LLC), 602 B.R. 208, 223 (Bankr. D. Mass. 2019) (dismissing claim for constructive fraudulent transfer where the complaint did not include any allegations concerning the value of the property transferred or the value received in exchange other than the allegation that the value received was less than the value of the property transferred); *see also* O'Halloran v. Prudential Savs. Bank (In re Island View Crossing II, L.P.), 604 B.R. 181, 198-99 (Bankr. E.D. Pa. 2019) (dismissing claim for constructive fraudulent transfer where the complaint alleged that debtor received $5 million loan and took on a $5 million mortgage plus the obligation to make payments on other debts, but the complaint did not explain how the formula for making those debt payments rendered the transaction constructively fraudulent).

Second, CRH alleges that Anthem paid other hospitals more than it paid CRH for the same or similar services due to the negotiating power or bargaining leverage of those other hospitals, and not as a result of any value added to the services by the other hospitals. This allegation suffers from the same basic defect as the first. Without any elaboration of the amounts paid to CRH and the amounts paid to the other hospitals, or any attempt to explain the delta

between these figures, these allegations may give rise to conjecture, but they do not create a reasonable inference that CRH did not receive reasonably equivalent value for the obligations it incurred under the Contracts and the Collection Agreements, or that Anthem paid CRH less than reasonably equivalent value for the Medical Services provided to Insureds.  *See* Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility [of entitlement to relief].  Where a complaint pleads facts that are merely consistent with [the plaintiff's legal theory], it stops short of the line between possibility and plausibility of entitlement to relief.") (quotation marks omitted).

At oral argument, CRH claimed that fair market value may not be the right metric by which to measure the value of the Medical Services provided to Insureds.  Instead, CRH claimed that the correct metric may be based on "what is sufficient for the business to remain open and viable."  It is not presently necessary to decide whether this is an appropriate benchmark by which to compare the value on either side of the transactions between CRH and Anthem.  In the abstract, the benchmark is suspect because it does not appear to jive with the purpose of fraudulent transfer laws.  Those laws exist not to keep struggling businesses afloat or to correct inefficiencies in any particular market, but to protect the value of assets that might satisfy the claims of unsecured creditors.[3]  Putting that issue aside, even if one were to adopt this unconventional interpretation of fraudulent transfer law and conclude that the value of the Medical Services provided could be gauged by reference to the amount necessary for CRH to remain in operation, the complaint says nothing about the amount that would be sufficient.  Short of this information (or any other information about the value of the Medical Services) and

---

[3] At oral argument, CRH did not cite to any cases or other authorities supporting its novel application of fraudulent transfer law.  Instead, CRH simply recounted its desire to explore the asserted pricing anomalies in the healthcare market, at least as far as those anomalies affect CRH.

information about the value that CRH received from Anthem in exchange, there is no way to make a reasonable inference that CRH received less than reasonably equivalent value. Without this inference, CRH fails to state any plausible claims to avoid either the challenged transfers or the challenged obligations as constructively fraudulent.

**Conclusion**

Counts I-IV will be dismissed for failure to state a claim under Rule 12(b)(6). Given the dismissal of the claims to avoid fraudulent transfers and obligations, the related claim for recovery of those avoided transfers and obligations in Count V will be dismissed as well. This disposition also applies to Count VI, which would permit disallowance of Anthem's claim against the estate only if property was recoverable from Anthem or Anthem was otherwise a transferee of an avoidable transfer. Because Anthem did not object, and CRH sought leave, CRH will be granted leave to replead. *See* 5B Wright & Miller, Federal Practice & Procedure § 1357 (3d ed.) (indicating that the plaintiff should be given "every opportunity to cure a formal defect in the pleading" even when the judge doubts such defects can be cured, and that leave to amend "should be refused only if it appears to a certainty that the plaintiff cannot state a claim").[4] With respect to Count VII, the motion will be denied. A separate order will issue.

Date: March 4, 2020

Michael A. Fagone
United States Bankruptcy Judge
District of Maine

---

[4] If CRH elects to replead any of its claims to avoid transfers or obligations as constructively fraudulent under section 544 and UFTA, it should identify the unsecured creditor holding an allowable claim who would be capable of avoiding the transfer or obligation. CRH should also do more than point to the contract or contracts in question; it should go further and identify the specific obligation or obligations that it seeks to avoid. This is particularly important here, where some of the obligations created by the contracts at issue have already been performed.